Filed 8/6/13  In re Nathan A. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NATHAN A., a Person Coming Under the Juvenile Court Law. | B245254 (Los Angeles County Super. Ct. No. CK82342) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. KARINA G., Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Debra Losnick, Juvenile Court Referee.  Reversed and remanded.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kim Nemoy, Deputy County Counsel, for Plaintiff and Appellant.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Respondent.

_____

The juvenile court granted Karina G. (Mother) reunification services with her newborn son Nathan A. despite finding that she (1) caused the death of a six-month-old daughter and (2) lost parental rights to her son Alex. There is no evidence that Mother resolved her past problems: on the contrary, Mother denies any wrongdoing. The court cannot order reunification services for a parent who caused another child's death unless there is clear and convincing evidence that reunification is in the surviving child's best interest. (Welf. & Inst. Code, § 361.5, subd. (c).)[1] Nothing in the record overcomes the presumption against reunification.

## FACTS

### The Prior Writ Proceeding

We take judicial notice of a writ opinion relating to the death of Mother's daughter Laylanee.[2] Below we summarize the facts and conclusions stated in the writ opinion.

Mother and her biological children, Alex and Laylanee, lived with three maternal relatives: the children's grandmother (MGM), aunt (Gabby), and an uncle. In October 2009, six-month-old Laylanee was found face down and motionless in her crib, and was pronounced dead by paramedics. In May 2010, the LAPD took two-year-old Alex into custody after the coroner's office deemed Laylanee's death "suspicious." When detained, Alex smelled bad, his clothing was stained and dirty, and his diaper was soaked.

Mother and the MGM were placed in an LAPD interview room, where their conversation was monitored. The MGM warned Mother not to change her "story," and the two women agreed that they needed to talk to Gabby before the LAPD did so. LAPD officers promptly interviewed Gabby, who told them that Mother inflicted Laylanee's injuries in the presence of the MGM. Gabby believed that Mother could "have done something" to Laylanee: Mother considered Laylanee to be a burden and resented the

[1]     Unlabeled statutory references are to the Welfare and Institutions Code.

[2]     *Karina G. v. Superior Court* (Mar. 23, 2011, B230008) (nonpub. opn.). The prior opinion is a related proceeding leading to the present appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 401; *In re Kinney* (2011) 201 Cal.App.4th 951, 954, fn. 3.)

baby because the biological father abandoned them due to Laylanee's birth. Gabby believed that Mother injured Laylanee's head, though she never saw Mother strike the baby.

The LAPD arrested Mother and the MGM for child abuse. (The MGM served time in 1993, when she was convicted of felony child cruelty for inflicting burns on Mother.) DCFS assumed custody of Alex and filed a dependency petition alleging that Laylanee suffered traumatic brain injuries while in Mother's care, placing Alex at risk of similar harm. Attached to the detention report was an autopsy report stating that Laylanee had brain malformations and hemorrhages indicating prior head trauma.

During interviews with DCFS, Mother stated that Laylanee was alive and well when Mother left to go shopping; the infant was being babysat by Gabby when she was discovered dead in her crib. When questioned about possible head trauma, Mother described an incident in which Laylanee accidentally rolled off the couch and onto the floor while Mother was in the kitchen: Mother did not seek medical attention because Laylanee was not bleeding. Mother initially insisted that this was the only incident in which Laylanee suffered head trauma. However, in a subsequent interview with law enforcement officials, Mother admitted that one month before Laylanee's death, she threw the baby up into the air and did not catch her. Laylanee landed on her head when she hit the floor. Mother did not seek medical attention for Laylanee.

A follow-up autopsy report by the coroner revealed evidence of three different head injuries occurring at different times, with no explanation that the injuries were not inflicted. The medical evidence indicated a reasonable probability that this is a case of battered child syndrome. Laylanee's death certificate was amended by adding the words "abusive head trauma" and the manner of death was ascribed to "homicide."

At the jurisdiction hearing, Mother invoked her Fifth Amendment right against self-incrimination and refused to testify. A neuropathologist from the coroner's office testified that he observed three injuries on Laylanee's brain. Two of the injuries were caused by a lack of oxygen, such as repeated episodes of suffocation or an obstructed airway. A subdural hematoma was likely caused by trauma to the baby's head. The

physician could not determine the cause of death based on his examination of Laylanee's brain alone, but was inclined to agree that Laylanee was a victim of battered child syndrome. The medical examiner who performed the initial autopsy testified that there were no signs of bruising or skeletal fractures; however, there was a brain hemorrhage occurring within 24 hours of death, and the brain appeared enlarged and abnormally shaped. The examiner agreed that "abusive head trauma" contributed to Laylanee's death in some fashion. A defense expert testified that Laylanee died of an acute brain bleed, likely due to brain malformations, and that the hematoma on the infant's brain possibly resulted from falling off the couch and more likely resulted from her head hitting the floor when Mother tossed her in the air but failed to catch her.

Maternal aunt Gabby testified that Mother was a "good mother" to Laylanee and Alex. She stated that LAPD detectives had subjected her to aggressive questioning and basically forced her to falsely implicate Mother in Laylanee's death. Gabby maintained that neither Mother nor the MGM was violent toward the children.

The juvenile court sustained allegations of endangerment against Mother and assumed jurisdiction over Alex. Mother asserted the Fifth Amendment and refused to testify about her progress with reunification services. The court found by clear and convincing evidence that Mother caused Laylanee's death by abuse and neglect, and that it would not be in Alex's best interest to reunify with Mother. The court terminated reunification services and scheduled a permanent placement hearing.

Mother filed a writ petition challenging the termination of reunification services and the scheduling of a hearing to consider termination of parental rights. This Court found ample evidence of repeated injury inflicted upon Laylanee, and that Mother caused the child's death through abuse or neglect. Mother admitted that Laylanee twice suffered head trauma in her care, once from rolling off a couch while unsupervised, and once when Mother tossed her in the air and her head struck the floor. Mother failed to seek medical attention in both instances. The testimony from physicians at the coroner's office showed that the baby sustained three different head injuries and was a battered child, leading to a coroner's finding that her death was a "homicide." Because Mother

4

caused Laylanee's death through neglect or abuse, the court properly denied reunification services with Alex. The petition for an extraordinary writ was denied.

<em>The Nathan A. Petition</em>

Mother's son Nathan was born in May 2012. At the hospital Mother was initially "nonresponsive" to her infant. She sought very little prenatal care and last saw a physician in November 2011. The hospital became suspicious and alerted DCFS after Mother disclosed that one of her babies died and her parental rights to the other child were terminated in March 2012.

In an interview with a DCFS social worker, Mother ascribed Laylanee's death to a congenital malformation. She maintained that she lied to the police when she told them that Laylanee fell from the sofa, or that she threw Laylanee up in the air and failed to catch her. Mother was happy with newborn Nathan because she feels that the baby's father, G.A. (Father) is supportive.

DCFS filed a petition on behalf of Nathan on May 14, 2012. It alleged that Nathan is at risk of serious physical harm because Mother caused the death of a sibling who was abused or neglected by Mother, and the death was deemed a homicide. Further, Nathan's sibling Alex received permanent placement services due to Laylanee's death. The court found a prima facie case for detaining Nathan from Mother's care and he was placed in Father's custody as a non-offending parent, under DCFS supervision. Mother was given monitored visitation.

A jurisdiction/disposition report was submitted by DCFS. In her statement, Mother was vague about the cause of Laylanee's death: she variously stated that Laylanee died from being in a broken baby crib that lacked a screw; she told police that "I tossed her in the air and I couldn't catch her and she fell on the floor"; she also told police on a different occasion that Laylanee fell from a couch. Mother insisted that "[t]here was no evidence that I did something. . . . I didn't do anything bad. I never abused them. The only big bad mistake was changing my versions" of how Laylanee sustained head injuries. Mother asserted that "it's unfair that we are in the system. I think it's unfair that they see my background."

5

In his statement, Father indicated that Mother told him at the outset of their relationship that "Laylanee passed away from SIDS."[3] Father attributed Mother's neglect to lack of maturity (Mother was 19 when Laylanee died) and a defective crib, saying, "I think it was the crib that caused the death. They didn't see any bruising. . . . My focus is on the crib because that's where they found her dead."

DCFS recommended that Mother receive no reunification services because she caused the death of a child. Mother gives conflicting stories about Laylanee's injuries and falsely told Father that the baby died of SIDS. Father denies the gravity of the situation, insisting that Laylanee died of SIDS even after he was presented with information regarding Laylanee's physical injuries and parental abuse. Father lacks insight into Mother's behavior.

In a last-minute addendum, DCFS reported that Mother was visiting three times weekly, with Father serving as a monitor. Mother claimed to have completed parenting, anger management and individual counseling, but was unable to produce certificates of completion. Upon speaking to the director of Mother's program, the DCFS social worker learned that Mother had recently enrolled and had participated in only two parenting sessions. Mother was not forthcoming about her compliance with the case plan, which minimized the probability of successful rehabilitation.

The petition was adjudicated on August 29, 2012. The court sustained allegations that Mother caused the death of a child in her care, thereby posing a risk of serious harm to Nathan. Nathan was declared a dependent child pursuant to section 300, subdivisions (a), (b), (f), and (j). Nathan's attorney asked the court to deny reunification services, given that there was a lengthy dependency trial for Mother's son Alex in which the court determined that Mother did, in fact, cause Laylanee's death. DCFS observed that Mother believes the big problem is that she changed her story too often, not that she caused a

---

**3**      SIDS is Sudden Infant Death Syndrome.

child's death. DCFS argued, "There is no sense of remorse. There is no sense of responsibility."

After acknowledging the opposition of DCFS and Nathan's attorney, the court granted Mother reunification services. It stated, "I do think that the child would benefit from the mother being ordered reunification services. I do feel that it may ameliorate the risk that may be presented to the child by the mother. The mother has already shown her willingness and ability to care for the child at least in the sense of breastfeeding the child." The court directed Mother to participate in parenting education and individual counseling with a licensed therapist who must be provided with all of Mother's DCFS history and reports. DCFS appeals.

## DISCUSSION

Appeal is taken from the disposition order granting Mother reunification services. (§ 395.) While family reunification services are generally offered when a dependent child is removed from parental physical custody, reunification services are not appropriate in every case. (*In re Ethan C.* (2012) 54 Cal.4th 610, 626.) Specifically, "the court *shall not order reunification*" for a parent who (1) killed a child, or (2) had reunification services terminated for a sibling or half sibling, or (3) had parental rights to a child permanently severed and has not subsequently made a reasonable effort to treat the problems that led to the child's removal. (§ 361.5, subd. (b)(4), (10), (11), and subd. (c), italics added.) When one or more of these conditions apply, the court is prohibited from ordering reunification services unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child. (§ 361.5, subd. (c); *In re Ethan N.* (2004) 122 Cal.App.4th 55, 64.)

When parental misconduct has culminated in a death, the circumstances that justify removal of the children from parental custody give rise to a presumption against reunification. (*In re Ethan C.*, *supra*, 54 Cal.4th at p. 634.) For example, a father who killed an unrelated child when both were minors may be denied reunification services during his adulthood. (*Mardardo F. v. Superior Court* (2008) 164 Cal.App.4th 481, 484, 489-490.) The Legislative has determined that in some situations, attempts to facilitate

7

reunification are likely to be futile and may not serve the child's best interests. (*D.B. v. Superior Court* (2009) 171 Cal.App.4th 197, 202.)

The juvenile court has discretion to decide whether reunification services are in the child's best interests. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229.) To determine whether reunification is in a child's best interests, a parent must demonstrate current ability to parent; the court also considers parental fitness and history; the seriousness of the problem that led to the dependency; the strength of the parent-child bond; and the child's need for stability and continuity. A best interest finding requires a showing that reunification services are likely to succeed. (*Id.* at p. 1228; *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116; *In re A.G.* (2012) 207 Cal.App.4th 276, 281.) If there is no substantial evidence in the record to support a decision to grant services, then the order for such services is an abuse of discretion. (*In re William B.*, *supra*, 163 Cal.App.4th at p. 1229.)

The juvenile court sustained jurisdictional findings that Mother caused Laylanee's death and that Laylanee's sibling Alex received permanent placement services due to Laylanee's death. Despite jurisdictional findings that triggered the nonreunification presumption in section 361.5, the court exercised its discretion and found that reunification is in Nathan's best interests because (1) services could ameliorate the risk to Nathan posed by Mother, and (2) Mother's willingness to breastfeed Nathan showed an ability to care for the child.

Mother made no effort to show that she treated the issues leading to Alex's adoption following Laylanee's death. In fact, she completely denies culpability. She now attributes Laylanee's death to SIDS caused by a broken baby crib and believes she lost Alex because she told too many versions of how Laylanee sustained head injuries. Far from coming to terms with her history, Mother complained it was "unfair" that DCFS should bring her history of child abuse or neglect to the court's attention.

Mother insists "there was no evidence that I did something bad. I never abused them." Yet evidence in the prior dependency proceeding showed that Mother knew Laylanee fell from a sofa and worse, was thrown into the air by Mother and landed on her

8

head.  Mother never sought medical treatment for Laylanee despite the patent likelihood that an infant who flies through the air and lands on its head will suffer a brain injury.  In short, there is no evidence in the record—let alone substantial evidence—that Mother has addressed the issues that led to the termination of her parental rights to Alex.

"[I]t is '"the enormity of a *death*"' of a child arising from parental inadequacy that invokes the provisions of sections 300 and 361.5.  [Citations.]  The Legislature has clearly provided that when one's abuse or neglect has had this tragic consequence, there is a proper basis for a finding that his or her surviving child may be made a dependent of the juvenile court, and that, if the circumstances then also justify the child's removal from the parent's or guardian's physical custody, a presumption against reunification should arise." (*In re Ethan C.*, *supra*, 54 Cal.4th at p. 634.)  Abuse that results in the death of a child "is simply too shocking to ignore" when granting reunification services with surviving children:  "The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification . . . ." (*In re Alexis M.* (1997) 54 Cal.App.4th 848, 851, fn. 2.)

The decision in *Ethan N.* is instructive.  There, a mother's neglect caused the death of Ethan's half-sibling, who died at the age of one month in 2001 from suffocation due to a wad of paper lodged deep in his esophagus, and suffered contusions to his head and back, a burn, anal penetration and 12 broken ribs.  She consequently lost her rights to two other children.  When Ethan was born in 2003, dependency jurisdiction was established under section 300, subdivisions (b), (f) and (j).  The court granted reunification services even though the mother caused the death of one child and lost her parental rights to surviving children.  (*In re Ethan N.*, *supra*, 122 Cal.App.4th at pp. 59-61.)

On appeal in *Ethan N.*, the trial court was found to have abused its discretion.  Substantial evidence supported the court's finding that the mother made progress toward alleviating her drug addiction by demonstrating sobriety and completing drug treatment programs.  (*In re Ethan N.*, *supra*, 122 Cal.App.4th at pp. 65-66.)  However, there was no substantial evidence that reunification was in Ethan's best interest.  Merely being Ethan's biological parent did not militate in favor of reunification.  The gravity of killing a small

9

child effectively swallowed up competing concerns about the possible benefit of reunification with a later-born child. (*Id.* at pp. 66-69. See also *Alexis M.*, *supra*, 54 Cal.App.4th 848 [father incarcerated for killing his infant by shaking and dropping him is not entitled to reunification services].)

In the view of the juvenile court, Mother demonstrated that she was capable of caring for a newborn because she was breastfeeding Nathan. Mother's breastfeeding is not clear and convincing evidence that reunification is in Nathan's best interests. The court either discounted or did not consider Mother's overall fitness and history, or the seriousness of the problem that led to the dependency. As detailed in our opinion in B230008, Mother resented and abused Laylanee because the child's birth caused the biological father to abandon them, and she neglected two-year-old Alex, who was filthy when he was detained. Mother is now taking an interest in Nathan because Father takes an interest in the boy. If Father were to leave Mother for a new girlfriend, or be incarcerated, there is a high risk that Mother would abuse or neglect Nathan. Certainly, Mother's indifference to the well-being of Laylanee and Alex does not bode well for her future treatment of Nathan.

A best interest finding requires a showing that reunification services are likely to succeed. That showing was not made in this case. Mother has zero insight into the misconduct that led to the death of Laylanee and the loss of Alex. Instead of striving to atone for her history of child abuse and neglect, Mother demands that everyone ignore that history because it is "unfair" to bring it up. She takes no responsibility for her conduct. Mother managed to convince Father that Laylanee died from a defective crib. He told DCFS that "My focus is on the crib because that's where they found her dead." He continued to insist that Laylanee died of SIDS even after he was presented with proof that Laylanee sustained three different head injuries occurring at different times, and her death was deemed a "homicide."

It appears that Father, as a non-offending parent, will keep custody of Nathan. It is chilling to know that Father refuses to accept that Mother is capable of killing an infant: without this insight, it is difficult to see how he can protect Nathan from harm.

10

While acknowledging the possibility that Father will allow Mother unfettered access to Nathan in the future, it does not justify the use of government resources to provide reunification services to an unrepentant parent who caused the death of a child in her care. The court erred by granting reunification services to Mother because there is no evidence that reunification is in Nathan's best interest and no showing that reunification services are likely to succeed.

## DISPOSITION

The order of the juvenile court granting reunification services to Karina G. is reversed and the matter is remanded for further proceedings.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

11